ASSOCIATION OF OIL PIPE
LINES, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Kaneb Pipe Line Operating Partnership,
L.P., et al., Intervenors.

Nos. 94–1538, 94–1644, 95–1051, 95–1052.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 9, 1996.

Decided May 10, 1996.

Keith R. McCrea argued the cause for petitioner/intervenor Association of Oil Pipe Lines, with whom Paul F. Forshay, Patrick H. Corcoran and Michele F. Joy, Washington, DC, were on the briefs.

Dennis Lane argued the cause for petitioner/intervenor Total Petroleum, Inc., et al., with whom David W. D'Alessandro was on the briefs. Kelly A. Daly and Roger A. Berliner, Washington, DC, entered appearances.

Eric L. Christensen, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent, with whom Jerome M. Feit, Solicitor, Janet K. Jones, Attorney, Anne K. Bingaman, Assistant Attorney General, United States Department of Justice, John J. Powers, III, and Robert J. Wiggers, Washington, DC, Attorneys, were on the brief.

Melvin Goldstein, Marcus W. Sisk, Jr., David W. D'Alessandro, Dennis Lane and R. Gordon Gooch were on the brief for intervenors Sinclair Oil Corporation, et al. Dena E. Wiggins, Washington, DC, entered an appearance.

Steven G. Reed and Steven H. Brose entered appearances for intervenors ARCO Transportation, Alaska, Inc. and Four Corners Pipeline Company. Cheryl M. Feik, Howard E. Shapiro and James C. Moffatt entered appearances for intervenor Kaneb Pipe Line Operating Partnership, L.P. Timothy M. Walsh, Washington, DC, entered an appearance for SFPP, L.P. Patrick G. Pitet, Findlay, OH, entered an appearance for intervenor Marathon Pipeline Company. Kevin M. Hawley entered an appearance for

intervenor Williams Pipe Line Company. Jeffrey G. DiSciullo, Washington, DC, entered an appearance for intervenor CKB Petroleum Corporation.

Before: SENTELLE, RANDOLPH and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

In Order No. 561,[1] and two companion orders, Order No. 571[2] and Order No. 572,[3] the Federal Energy Regulatory Commission ("Commission") comprehensively revised its oil pipeline regulations in response to the mandate of the Energy Policy Act of 1992 ("EPAct").[4] Both pipelines and shippers challenge the Commission's new ratemaking scheme on two main grounds: first, whether the Commission properly selected the Producer Price Index for Finished Goods minus one percent ("PPI–1%") as the appropriate inflation index for the price ceiling on oil pipeline rates, and second, whether the Commission adopted reasonable procedures for implementing the indexed price ceiling.[5] We conclude that by establishing a general in-

dexing methodology along with limited exceptions to indexed rates, the Commission has reasonably balanced its dual responsibilities of ensuring just and reasonable pipeline rates and simplifying and streamlining rate-making through generally applicable procedures. *See* Interstate Commerce Act ("ICA") §§ 1–15;[6] EPAct §§ 1801, 1802. We therefore also conclude that the Commission's rate orders are a reasoned exercise of its statutory authority and deny the petitions for review.

After briefly reviewing the background of the Commission's orders in Part I, we address a notice-and-comment challenge in Part II and then address the challenges to the Commission's choice of index in Part III, to the rate-decrease provisions in Part IV, and to the market-based and cost-based alternatives, as well as to the protest and complaint procedures, in Part V.

**I.**

**Background.** Oil pipelines have been subject to rate regulation under the Interstate Commerce Act since the enactment of the Hepburn Act in 1906. Pub.L. No. 59–337, 34 Stat. 584. For decades, the Interstate Com-

---

1. Order No. 561, *Revision to Oil Pipeline Regulations Pursuant to the Energy Policy Act of 1992,* [Current] F.E.R.C. Stats. & Regs. (CCH) ¶ 30,985 (Oct. 22, 1993), 58 Fed.Reg. 58,753 (Nov. 4, 1993) ("Order No. 561"), *order on reh'g,* Order No. 561–A, [Current] F.E.R.C. Stats. & Regs. (CCH) ¶ 31,000 (July 28, 1994), 59 Fed.Reg. 40,-243 (Aug. 8, 1994) ("Order No. 561–A").

2. Order No. 571, *Cost-of-Service Reporting and Filing Requirements for Oil Pipelines,* [Current] F.E.R.C. Stats. & Regs. (CCH) ¶ 31,006 (Oct. 28, 1994), 59 Fed.Reg. 59,137 (Nov. 16, 1994) ("Order No. 571"), *order on reh'g,* Order No. 571–A, [Current] F.E.R.C. Stats. & Regs. (CCH) ¶ 31,012 (Dec. 28, 1994), 60 Fed.Reg. 356 (Jan. 4, 1995) ("Order No. 571–A").

3. Order No. 572, *Market–Based Ratemaking for Oil Pipelines,* [Current] F.E.R.C. Stats. & Regs. (CCH) ¶ 31,007 (Oct. 28, 1994), 59 Fed.Reg. 59,-148 (Nov. 16, 1994) ("Order No. 572"), *order on reh'g,* Order No. 572–A, 69 F.E.R.C. ¶ 61,412 (Dec. 28, 1994) ("Order No. 572–A").

4. Pub.L. No. 102–486, §§ 1801–1804, 106 Stat. 2776, 3010–12 (1992), *reprinted in* 42 U.S.C. § 7172 note (1994).

5. The court consolidated the petitions for review of Orders No. 561, 571, and 572 filed by the

Association of Oil Pipe Lines, *et al.* in Nos. 94–1538, 95–1051, and 95–1052 with the petition for review of Order No. 561 filed by Total Petroleum, Inc., Alberta Department of Energy, and the Canadian Association of Petroleum Producers in No. 94–1644. In addition, nineteen other pipelines and shippers are intervenors. For ease of reference we refer to the pipeline petitioners as "AOPL" and the shipper petitioners as "Total."

6. In the Department of Energy Organization Act, Pub.L. No. 95–91, § 402(b), 91 Stat. 565, 584 (1977), *codified at* 42 U.S.C. § 7172(b) (1988) (repealed 1994), *recodified as amended at* 49 U.S.C.A. § 60502 (West 1996), Congress transferred regulatory authority over oil pipelines from the Interstate Commerce Commission to the Federal Energy Regulatory Commission. In the Revised Interstate Commerce Act, Pub.L. No. 95–473, 92 Stat. 1337 (1978), Congress recodified the ICA, *see* 49 U.S.C. §§ 10101–11917 (1988), but provided that oil pipeline regulation remained governed by the ICA as it existed on October 1, 1977. *See* Pub.L. No. 95–473, § 4(c), 92 Stat. at 1470. All references to the ICA in this opinion are to the version before repeal, which can be found in 49 U.S.C. §§ 1–15 (1976), or reprinted in 49 U.S.C. app. §§ 1–15 (1988).

merce Commission applied the "fair value" ratemaking methodology initially required in *Smyth v. Ames,* 169 U.S. 466, 546–47, 18 S.Ct. 418, 433–34, 42 L.Ed. 819 (1898), even after the Supreme Court adopted the more permissive "end result" test in *FPC v. Hope Natural Gas Co.,* 320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944). In the first judicial review of an oil pipeline ratemaking proceeding, which occurred just as Congress transferred regulatory authority to the newly created FERC, *see supra* note 6, the court ordered the Commission to reconsider the valuation methodology. *Farmers Union Central Exchange v. FERC,* 584 F.2d 408, 412–22 (D.C.Cir.1978) (*Farmers Union I*), *cert. denied,* 439 U.S. 995, 99 S.Ct. 596, 58 L.Ed.2d 669 (1978). The court explained that the regulation of oil pipelines differed in several respects from other public-utility regulation and concluded that "we have little to rely on in constructing a theory of oil pipeline ratemaking." *Id.* at 413. When the Commission adhered to the valuation methodology on remand and announced its intent to conduct only very light-handed regulation, the court again reversed and ordered the Commission to comply with its duty under ICA § 1(5) to ensure that oil- pipeline rates "shall be just and reasonable." *Farmers Union Central Exchange v. FERC,* 734 F.2d 1486, 1500–10 (D.C.Cir.) (*Farmers Union II*), *cert. denied,* 469 U.S. 1034, 105 S.Ct. 507, 83 L.Ed.2d 398 (1984).

On remand from *Farmers Union II,* the Commission adopted the cost-based ratemaking methodology that remained in effect until Order No. 561. In Opinion No. 154–B, *Williams Pipe Line Co.,* 31 F.E.R.C. ¶ 61,377 (1985), *opinion on reh'g,* 33 F.E.R.C. ¶ 61,327 (1985), the Commission prescribed the "trended original cost" method of calculating a pipeline's rate base, under which a pipeline recovers only a real (inflation-adjusted) rate of return each year, but the inflation component of the nominal rate of return is added to the rate base.[7] The starting rate base was a modified version of the rate base under the valuation methodology. As an alternative to cost-based rates, the Commission also developed a procedure for market-based rates. Responding to the admonition by the *Farmers Union II* court that the Commission could not permit market-based rates without findings as to the effectiveness of competition in the relevant market, 734 F.2d at 1508–10, the Commission developed a two-phase procedure that requires pipelines to demonstrate a lack of significant market power in order to qualify for market-based rates. *Buckeye Pipe Line Co.,* 44 F.E.R.C. ¶ 61,066 (1988), *reh'g denied,* 45 F.E.R.C. ¶ 61,046 (1989).

"[I]n order to reduce costs, delays, and uncertainties," H.R.REP. No. 474, pt. 1, 102d Cong., 1st Sess. 225, *reprinted in* 1992 U.S.C.C.A.N. 1953, 2048, Congress in the EPAct directed the Commission to "issue a final rule which establishes a simplified and generally applicable ratemaking methodology for oil pipelines in accordance with section 1(5) of Part I of the Interstate Commerce Act" (which requires just and reasonable rates), by October 24, 1993. EPAct § 1801(a), 106 Stat. at 3010. Congress further required the Commission to issue, by April 24, 1994, "a final rule to streamline procedures of the Commission relating to oil pipeline rates in order to avoid unnecessary regulatory costs and delays." *Id.* § 1802(a), 106 Stat. at 3010. Congress also declared in the EPAct that oil pipeline rates that had not been protested or opposed for a one-year period before October 24, 1992, were "deemed to be just and reasonable (within the meaning of section 1(5) of the Interstate Commerce Act)," subject to narrow exceptions. *Id.* § 1803(a), 106 Stat. at 3011. These provisions were part of a comprehensive bill to reform national energy policy generally, in response to energy price shocks in the prior two decades, and were intended to streamline regulatory provisions and to "give pricing flexibility to oil pipelines, while preventing excessive rates and charges against any captive shippers on oil pipelines." H.R. REP. No. 474, pt. 1, 102d Cong., 2d Sess.

---

7. The trended original cost method differs from the depreciated original cost method that the Commission uses for natural gas pipelines and electric utilities only in the timing of the recovery of capital costs in periods of inflation. Opinion No. 154–B, 31 F.E.R.C. ¶ 61,377, at 61,834; *see also* RICHARD J. PIERCE, JR. & ERNEST GELLHORN, REGULATED INDUSTRIES 106–07 (3d ed. 1994).

132, 153, *reprinted in* 1992 U.S.C.C.A.N. at 1955, 1976.

To fulfill the EPAct's mandate for a streamlined process, the Commission established an indexed ratemaking methodology designed to enable pipelines to recover costs by allowing pipelines to raise rates at the same pace as they are predicted to experience cost increases. Order No. 561, at 30,941. As the Commission explained, simplification results from the elimination, with rare exceptions, of rate-specific examinations of costs. Order No. 561–A, at 31,092.[8] This indexing scheme used the EPAct's pre-approved rates as a baseline and set caps for rate increases based on an inflation index.

Of central importance to the Commission's scheme is its choice of index. Initially, the Commission's staff recommended that the Commission base its indexing scheme on the PPI–1%.[9] *See* Commission Staff Proposal for Revisions to Oil Pipeline Regulation Pursuant to the Energy Policy Act of 1992, at 24 (Mar. 18, 1993) ("Staff Proposal"). After receiving extensive comments from AOPL and other pipelines, the Commission in its notice of proposed rulemaking ("NOPR") proposed a methodology based on a different index: the Gross Domestic Product, Implicit Price Deflator ("GDP–IPD").[10] [Current] F.E.R.C. Stats. & Regs. (CCH) ¶ 32,497, at 32,727–29 (July 2, 1993); 58 Fed.Reg. 37,671 (July 13, 1993). Again, after receiving extensive comments and new evidence in response to the Commission's proposal, and upon consideration of the entire record, the Commission in its final rule embraced the PPI–1%. The Commission concluded that the PPI–1%

"comes closest of all the indices considered in this rulemaking to tracking the historical changes in the actual costs of the product pipeline industry." Order No. 561, at 30,951.

Recognizing the need for some flexibility in light of the inherent limitations of any indexing system, Order No. 561, at 30,949, the Commission announced that the PPI–1% "is not a choice for all time." Order No. 561–A, at 31,093. In order to assure that the nexus between the rate ceiling and pipeline costs is maintained, the Commission stated that it will monitor the index's ability to track changes in pipeline costs and review the appropriateness of its choice of index, in light of the just and reasonable standard of the ICA, every five years, starting July 1, 2000.[11] Order No. 561–A, at 31,092; Order No. 561 at 30,947, 30,952. In addition, although the indexed methodology is designed to cover the bulk of pipelines "as a general rule," the Commission's new scheme is not "constrained to the mechanical application of a single formula." *Farmers Union II,* 734 F.2d at 1527. Rather, the Commission has designed the scheme to allow three alternative methods of changing rates, in specific, limited circumstances. Order No. 561, at 30,947.

First, a pipeline can file for individualized cost-of-service rates, like those formerly required under Opinion No. 154–B, "if it shows that there is a substantial divergence between the actual costs experienced by the carrier and the rate resulting from the application of the index such that the rate at the ceiling level would preclude the carrier from

---

8. *But cf.* Order No. 561, at 30,977–4 to 30,977–5 (Massey, Comm'r, dissenting) (arguing that a simplified, generally applicable cost-of-service methodology would have better complied with the EPAct).

9. The PPI–FG is a macroeconomic measure of inflation measuring price changes for commodities that will not undergo further processing. Staff Proposal at 24. Because it is a fixed-weight index of commodity prices taken at the producer level, it does not, unlike the GDP–IPD, *infra* n. 10, include service industries other than energy services. Moreover, the PPI–FG does not include oil pipeline transportation services. During the period from 1987 to 1991, the PPI–FG ranged from 2.5% in 1988 to 5.2% in 1989, and back down to 2.1% in 1991.

10. The GDP–IPD is a macroeconomic measure of overall inflation in the economy. This indicator includes service industries and has been influenced in recent years by rapidly escalating health-care costs. Staff Proposal at 21. In the 5–year period from 1987 to 1991, it ranged from about 3.9% in 1988 to a peak of 4.4% in 1989, and down to a level of about 4.1% in 1991.

11. The Commission has expanded its annual reporting requirement in order to obtain the basic information needed to review rate filings made within the indexed cap. Order No. 571, at 31,167–73 (describing revisions to Form No. 6, the Annual Report for Oil Pipelines); Order No. 571–A, at 31,253–54.

being able to charge a just and reasonable rate within the meaning of the Interstate Commerce Act." 18 C.F.R. § 342.4(a); *see also* Order No. 561–A, at 31,091–92.[12] The Commission will accept cost-based rate filings only after a pipeline files certain information and thereby makes a *"prima facie* demonstration" of "substantial divergence." Order No. 571, at 31,164–65; *see also* 18 C.F.R. §§ 346.1–346.2. Second, a pipeline may employ market-based rates if it is able to make "an affirmative showing that the oil pipeline lacks significant market power in the relevant markets." Order No. 572, at 31,181; *see* 18 C.F.R. § 342.4(b). The Commission also adopted filing requirements and procedures whereby a pipeline may demonstrate its lack of market power, which replace the *Buckeye* procedures for eligibility for market-based rates. 18 C.F.R. §§ 348.1–348.2; *see also* Order No. 572, at 31,184–86. Third, a pipeline may file a rate change where it can secure the agreement of all existing customers.[13] 18 C.F.R. § 342.4(c); *see also* Order No. 561, at 30,947.

The Commission also adopted procedures for § 15(7) protests to rate changes and § 13(1) complaints against existing rates under the indexing system. Even though a pipeline's rate is within the rate ceiling, a shipper may file a protest or complaint if it can "allege reasonable grounds for asserting that the rate increase is so substantially in excess of the actual cost increases incurred by the carrier that the rate is unjust and unreasonable, or that the rate decrease is so substantially less than the actual cost decrease incurred by the carrier that the rate is unjust and unreasonable." 18 C.F.R. § 343.2(c)(1); *see also* Order No. 561, at 30,955. Once the shipper makes that showing, the ultimate burden of proof in a § 15(7) protest lies on the pipeline to justify a rate change. Order No. 561, at 30,955 n. 74, 30,965. In a § 13(1) complaint, the shipper bears the burden of proof to show that the

existing rate is unjust or unreasonable. *Id.* at 30,955–56.

■■■ Although petitioners do not challenge the Commission's decision to establish an indexed ratemaking scheme, they raise procedural and substantive objections to the new scheme. In reviewing these challenges, the court's role is limited to determining whether the Commission's action was arbitrary and capricious. 5 U.S.C. § 706 (1994); *Farmers Union II*, 734 F.2d at 1498–99. Simply put, the court conducts a "searching and careful" inquiry, *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971), in order to assure that the Commission has "examine[d] the relevant data and articulate[d] . . . a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (quotation omitted). Because the subject of our scrutiny is a ratemaking—and thus an agency decision involving complex industry analyses and difficult policy choices—the court will be particularly deferential to the Commission's expertise. *See Time Warner Entertainment Co. v. FCC*, 56 F.3d 151, 163 (D.C.Cir.1995) ("Because agency ratemaking is far from an exact science and involves policy determinations in which the agency is acknowledged to have expertise, our review thereof is particularly deferential." (quotation omitted)), *cert. denied,* —— U.S. ——, 116 S.Ct. 911, 133 L.Ed.2d 842 (1996); *see also Permian Basin Area Rate Cases*, 390 U.S. 747, 790, 88 S.Ct. 1344, 1372, 20 L.Ed.2d 312 (1968) ("[T]he breadth and complexity of the Commission's responsibilities demand that it be given every reasonable opportunity to formulate methods of regulation appropriate for the solution of its intensely practical difficulties.").

## II.

■■ **Procedural objections: notice and opportunity to comment.** The pipeline pe-

---

12. The "substantial divergence" standard represents a revision from Order No. 561, in which the Commission initially pronounced that a pipeline could not charge cost-of-service rates unless it could demonstrate that it had "experienced uncontrollable circumstances that preclude re-

coupment of its costs through the indexing system." Order No. 561, at 30,947.

13. The petitioners do not challenge the Commission's rate orders with respect to the settlement method of establishing rates.

titioners contend that the Commission's rulemaking procedure failed to provide interested parties adequate notice and opportunity to comment to satisfy the Administrative Procedure Act ("APA"). 5 U.S.C. § 553(b)(3), (c) (1994). Specifically, AOPL contends that the Commission's selection of the PPI–1% formula for its indexation scheme was not a "logical outgrowth" of its notice of proposed rulemaking (NOPR), which proposed the GDP–IPD formula instead of the PPI–1%. *See American Fed'n of Labor v. Donovan,* 757 F.2d 330, 338 (D.C.Cir.1985).

■ The record shows, however, that interested parties had ample opportunity to comment on the appropriateness of the PPI–1% relative to other inflationary indexes. When the Commission made available for public comment its Staff Proposal recommending use of the PPI–1%, it put the industry on notice that this index was being considered for the new ratemaking scheme. Throughout the proceedings, in response to both the Staff Proposal and the NOPR, pipelines and shippers submitted comments debating the appropriateness of the PPI–1%. *See Shell Oil Co. v. EPA,* 950 F.2d 741, 751 (D.C.Cir.1991) ("[C]omments raising a foreseeable possibility of agency action can be a factor in providing notice. . . ."). AOPL itself voiced objections to the PPI–1% in its response to the Staff Proposal, in comments after the NOPR proposed the use of the GDP–IPD, on rehearing after the issuance of Order No. 561, and again in response to a request by the Commission for additional submissions on indexation methodology. Hence, AOPL was plainly "alerted . . . to the possibility" of the Commission's adopting an indexing methodology based on the PPI–1% formula. *Kooritzky v. Reich,* 17 F.3d 1509, 1513 (D.C.Cir.1994). An agency is "free to adjust or abandon [its] proposals in light of public comments or internal agency reconsideration without having to start another round of rulemaking." *Id.* Such flexibility avoids

" 'the absurdity that . . . the agency can learn from the comments on its proposals only at the peril of starting a new procedural round of commentary.' " *Shell Oil,* 950 F.2d at 750–51 (*quoting International Harvester Co. v. Ruckelshaus,* 478 F.2d 615, 632 n. 51 (D.C.Cir.1973)).

■ AOPL further contends that it lacked an opportunity to comment on the Commission's reasons for rejecting the GDP–IPD index, which AOPL claims were not articulated until the order on rehearing. Although the Commission declared in Order No. 561 that the PPI–1% "comes the closest of all the indices considered in this rulemaking to tracking the historical changes in the actual costs of the product pipeline industry," Order No. 561, at 30,951, it did not elaborate the perceived flaws with the GDP–IPD until Order No. 561–A, at 31,095. However, the APA imposes no obligation on the Commission to provide any opportunities for rehearing, let alone for a further rehearing order. *Cf. ICC v. Brotherhood of Locomotive Eng'rs,* 482 U.S. 270, 284–85, 107 S.Ct. 2360, 2368–69, 96 L.Ed.2d 222 (1987) (holding that a party is not required under the APA or the Hobbs Act to petition for review).[14] Accordingly, it makes no difference whether the Commission articulated its reasons for rejecting the GDP–IPD index in its final rule or on rehearing. The Commission provided the technical basis for its ultimate decision to select the PPI–1% formula in the staff proposal and the NOPR. *See Solite Corp. v. EPA,* 952 F.2d 473, 484 (D.C.Cir.1991); *Connecticut Light & Power Co. v. NRC,* 673 F.2d 525, 530–31 (D.C.Cir.), *cert. denied,* 459 U.S. 835, 103 S.Ct. 79, 74 L.Ed.2d 76 (1982). In addition, AOPL has not shown that it was prejudiced in any way. *See Community Nutrition Institute v. Block,* 749 F.2d 50, 58 (D.C.Cir. 1984). Accordingly, we find AOPL's APA contentions unpersuasive.

---

**14.** The Commission erroneously relies on *Southern Natural Gas Co. v. FERC,* 877 F.2d 1066, 1072–73 (D.C.Cir.1989), which holds only that, under the mandatory-rehearing rule of § 19(b) of the Natural Gas Act, 15 U.S.C. § 717r(b), a party is not required to seek rehearing of a Commission order providing a new rationale before it may seek judicial review. Despite the transfer of

authority over oil pipeline cases to the Federal Energy Regulatory Commission, judicial review of such cases lies under the Hobbs Act, 28 U.S.C. §§ 2321, 2341–51, which does not require a party to seek rehearing. *See* 42 U.S.C. § 7192(a). Moreover, *Southern Natural* has no bearing on an agency's obligation to provide opportunity for comment.

## III.

■ **Choice of index. A. Pipeline challenges.** AOPL contends that the Commission's selection of the PPI–1% formula, rather than the GDP–IPD, is arbitrary and capricious and unsupported by substantial evidence on the record. *See* 5 U.S.C. § 706(2)(A), (E); *see also Farmers Union II*, 734 F.2d at 1499–1500. Essentially, AOPL makes a sweeping claim that the Commission acted without "a scintilla of credible evidence" to support its conclusion that PPI–1% tracks industry-wide cost changes more accurately than any other index that was considered. *See* Order No. 561, at 30,951. Rather, AOPL asserts, the Commission's orders "cobble together pieces of flawed evidence" to rationalize its choice of index, and hence its adoption of the PPI–1% fails the test of reasoned decision making. In fact, the record reveals that the Commission exercised reasoned judgment in selecting the PPI–1% over the GDP–IPD as the most suitable index "to accommodate normal cost changes." Order No. 561–A, at 31,097.

In concluding in Order No. 561 that the PPI–1% formula tracked past cost changes most closely, the Commission relied on a study by Alfred Kahn.[15] *See* Order No. 561, at 30,951 & n. 52. Kahn examined the annual rates of change for operating expenses per barrel-mile and net plant per barrel-mile for the period from 1982 to 1992, based on pipelines' filings with the Commission.[16] Because the figures "var[ied] erratically," Kahn analyzed only the middle 50% of pipelines. Kahn Study at 8–9. He calculated three alternative measures of the annual rate of change: the median, the unweighted mean (average), and an average weighted by num-

ber of barrel-miles. Then he combined these three figures into a "composite" measure, which he described as "a pragmatic effort to provide a single reflection of the behavior of 'industry' costs for comparison with the changes in the PPI–FG and GDP deflator." *Id.* at 9. Kahn's study found that for product pipelines[17] the composite measure of annual cost change between 1982 and 1992 was 1.21%—by comparison, the PPI was 2.11% and the GDP–IPD was 3.73%. *Id.* at 11 tbl. 1. Therefore, Kahn concluded that for product pipelines, "the Commission should consider using as its index the PPI–FP minus 0.5 percent to 1.0 percent." *Id.* at 12. Kahn also conducted a tentative study of crude pipelines, which indicated that the GDP deflator was a better index than the PPI, but Kahn emphasized that problems with the crude-pipeline data necessitated further study. *Id.* at 17–20.

In its comments on rehearing, AOPL attached a statement criticizing Kahn's study from John Klick.[18] Klick identified three "statistical errors" in Kahn's study, in particular the use of only the middle 50% of pipelines, the creation of the composite measure, and the exclusion of crude pipelines. Klick Study at 10–16. Klick conducted his own study of cost changes for all pipelines from 1987 to 1992 and concluded that—whether one looked to Kahn's composite measure or instead the weighted average, which Klick believed to be the appropriate measure—past costs were closer to the GDP deflator than to the PPI. The shippers responded with a study by Robert Means.[19] Means recalculated Kahn's figures for all product pipelines, rather than just the middle 50%, and found that, for the period from 1987 to 1992, the composite measure of annual cost change was 2.20%—almost exactly one percent less than

**15.** Testimony of Alfred E. Kahn on Behalf of a Group of Independent Refiner/Shippers (Aug. 12, 1993) ("Kahn Study"). Kahn is the author of *The Economics of Regulation* (1970), and was chairman of the Civil Aeronautics Board from 1977 to 1978.

**16.** Net plant is defined as the investment in plant less accumulated depreciation. Kahn Study at 15.

**17.** Crude oil pipelines transport unrefined petroleum; product pipelines transport refined petro-

leum products and liquid hydrocarbons other than crude oil, such as gasoline, diesel fuel, and natural gas liquids.

**18.** Verified Statement of John C. Klick on behalf of the Association of Oil Pipelines (Nov. 22, 1993) ("Klick Study").

**19.** Testimony of Robert C. Means on Behalf of Sinclair Oil Corporation and the National Council of Farmer Cooperatives (Dec. 9, 1993) ("Means Study").

the PPI, which was at 3.17%. Means Study at 21 tbl. 2.

In Order No. 561–A, the Commission noted that the original staff proposal had also favored using the PPI–1% as the index, such that the choice of the PPI–1% in the final rule "did not hinge exclusively on Dr. Kahn's testimony nor solely on his statistical presentation of pipeline costs." Order No. 561–A, at 31,094. The Commission defended Kahn's use of the middle 50% of pipelines as a reasonable way of selecting an index formula that tracked costs for the central range of pipelines, given the wide divergence of cost changes in the industry. *Id.* at 31,096–97. The Commission analogized the use of the middle 50% of pipelines to the use of a median, which is "often preferred statistically as a measure of central tendency in cases where the distribution is highly skewed." *Id.* at 31,097. Moreover, the Commission specifically criticized the GDP–IPD index because it (1) directly reflects rapid inflation in consumer services, such as health care, while oil pipelines pay such costs only indirectly, if at all; (2) reflects changes in the composition of the GDP, and thus is upwardly biased due to the growing size of inflationary sectors of the economy; (3) is periodically revised for up to five years after initial publication, and therefore would not provide a stable framework for a ratemaking scheme; and (4) is not recommended by the Bureau of Economic Analysis in the Department of Commerce, which constructs the index, for use as a measure of price change. *Id.* at 31,095.

■ AOPL makes three challenges to the methodology of the Kahn Study. An agency that relies on a study must examine the methodology used to conduct the study. *See City of New Orleans v. SEC,* 969 F.2d 1163, 1167 (D.C.Cir.1992). In Order No. 561–A, the Commission carefully analyzed the methodology behind Kahn's study, and we will defer to its judgment in this highly technical area.

First, AOPL attacks Kahn's use of the middle 50% of pipelines for leading to a downwardly skewed result. In particular, AOPL maintains that the exclusion of the top and bottom quartiles of cost changes in net plant was improper because of the sporadic nature of capital costs. However, the Commission fully addressed this objection and explained that the use of the middle 50% of pipelines better captured the "central tendency" of cost changes in the industry. Order No. 561–A, at 31,097.[20] The Commission reasonably concluded that if it were to select an index "sufficiently high and generous to encompass even the most extraordinary costs, it would provide windfalls to many oil pipelines by allowing rate changes substantially above cost changes," which would "effectively abdicate [the Commission's] responsibilities for rate regulation under the ICA." *Id.* In any event, the Commission also relied on the Means study, which came to similar results using data for all product pipelines.

Second, AOPL challenges Kahn's use of the composite cost measure, relying on Klick's criticism of the composite measure as "statistically meaningless." But Kahn explained that each of the three components of the composite measure—the median, the unweighted mean, and the weighted mean— "captures a significant aspect of the composite results from an industry perspective." Kahn Study at 9. Means agreed that the composite measure struck a good balance between reflecting the cost-change experience of each individual pipeline and giving greater weight to larger pipelines. Means Study at 19–20. Thus, substantial evidence supported the use of the composite measure. In any event, the data from Kahn's study show that the PPI was a better fit than the GDP–IPD, even if cost changes are measured by the weighted average, as Klick suggested. Kahn Study at 11 tbl. 1.

Third, AOPL contends that the Commission ignored Kahn's finding that the GDP–IPD tracked cost changes for crude oil pipelines better than the PPI, and therefore erred in applying the PPI–1% formula to crude oil pipelines. Yet the Commission rea-

---

20. AOPL also claims that the Commission incorrectly regarded the use of the middle 50% of pipelines as a "median." In fact, the Commission analogized the use of the middle 50% to the use of a median, in that both capture the central tendency and are not "influenced by one or two extreme outliers." Order No. 561–A, at 31,097.

sonably relied on Kahn's express caveat that findings on crude oil pipelines were "highly tentative" and potentially unreliable in light of the "limited evidence" and "erratic" nature of data available for crude oil pipelines. Kahn Study at 17; *see also* Means Study at 23–25. Moreover, AOPL suggests no reason why product pipelines are not a reasonable proxy for the entire industry and, in fact, submitted testimony to the Commission suggesting that product and crude oil pipeline costs should not be separated for purposes of analysis. Klick Study at 13–14.

Aside from the methodological criticisms of the Kahn Study, AOPL fails to show that the Commission's rejection of the GDP–IPD index in any way was arbitrary and capricious. The Commission explained that while both the GDP–IPD and the PPI–FG are "commonly considered and used as measures of general inflation," the GDP–IPD has "sufficiently serious" flaws, both as a measure of inflation and as a contractual price escalator. Its two most important flaws are that "(1) it is *not* simply a measure of price change, but it also reflects changes in the composition of GDP, and (2) it is subject to revision for up to five years after its publication." Order No. 561–A at 31,095. AOPL offers no effective response to these problems with using the GDP–IPD as an index for oil pipeline costs. AOPL's suggestion that the Commission use the GDP–IPD as of a date certain, such as the date of its initial publication, fails to confront the fact that it is inaccurate until revised. The fact that the GDP–IPD reflects changes in the relative weights of different sectors of the economy makes it less accurate for cost changes within a single industry, which is why the Bureau of Economic Analysis does not recommend its use as a measure of price change.[21] In particular, the Commission feared that inflationary sectors such as health-care costs would be over-represented in the GDP–IPD.[22]

■ AOPL also challenges the Commission's decision to use the PPI–1%, rather than simply the PPI.[23] In the original staff proposal, the staff recommended an index one percent lower than the PPI as "an offset for productivity." Staff Proposal at 24. AOPL therefore attacks the basis for assuming that the oil pipeline industry will experience above-average productivity gains in the future. But in the final rule, the Commission justified the PPI–1% only on the basis that it "comes the closest" to actual past cost changes. Order No. 561, at 30,951. The Kahn Study supplied substantial evidence that the unadjusted PPI "appears to err on the side of generosity." Kahn Study at 1. AOPL's objection that the one-percent offset violates the Commission's goal of preserving rates in real terms ignores the Commission's finding that the PPI–1% is the most likely formula to keep rates at their real value.

Finally, AOPL contends that the Commission's rejection of the GDP–IPD is inconsistent with its use of the GDP–IPD in *Buckeye Pipe Line Co.*, 53 F.E.R.C. ¶ 61,473 (1990), *order on reh'g*, 55 F.E.R.C. ¶ 61,084 (1991). In *Buckeye*, the Commission approved an experimental program, in which in every market for which the pipeline demonstrated that it lacked market power it would be free to raise rates "without suspension or investigation if they do not exceed the change in the

**21.** On the other hand, as the Commission noted in the NOPR, because the GDP–IPD index "covers the broadest range of goods and service, [it] is the least volatile of general inflation indices." NOPR at 26. Although AOPL contends that the Commission in Order No. 561–A ignored the greater volatility of the PPI–1%, the Commission in fact addressed the correlative drawbacks of the broad-based nature of the GDP–IPD.

**22.** Order No. 561–A, at 31,095–96. AOPL simply misstates the record when it contends that the Commission mistakenly assumed that pipelines *are* wholesalers. Rather, the record shows that the Commission concluded that pipelines experience cost increases in consumer services like health care only indirectly, just as wholesalers do.

**23.** The Commission claims that the court is without jurisdiction to address AOPL's challenge to the use of the one-percent offset because AOPL did not raise that argument in its comments to the Commission. However, this issue was raised in rehearing requests by Phillips Pipe Line Company and by TE Products Pipeline Company. The exhaustion requirement does not apply when another party has raised the arguments at issue before the agency. *Cellnet Communication, Inc. v. FCC*, 965 F.2d 1106, 1109 (D.C.Cir.1992); *Natural Resources Defense Council, Inc. v. EPA*, 824 F.2d 1146, 1151 (D.C.Cir.1987) (in banc).

GNP deflator since the rate was last increased, plus 2 percent." *Id.* at 62,675. As the Commission points out, *Buckeye* deals with a pipeline without market power; the Commission fulfilled its duty to ensure "just and reasonable rates" in the Phase I market-power analysis.[24] Indeed, the market-based rate procedures approved in Order No. 572 do not contain any rate cap. Thus, the rate cap in *Buckeye* served a different purpose from the indexing rate cap adopted in Order No. 561.

**B. Shipper Challenges.** For the shippers, on the other hand, the Commission's choice of indexing methodology is objectionable because, in their view, that scheme will result in unreasonably high rates. Total's principal contention is that the Commission arbitrarily decided to index all pipeline costs without adequately considering the option of a selective indexing scheme in which only inflation-driven costs would be indexed.[25] The record shows, however, that the Commission considered the options and has articulated reasoned grounds for its choice of a full, rather than a selective indexing scheme.

First, empirical evidence in the record demonstrates that the application of the PPI–1% to the total pipeline rate, rather than to selected costs, was a better historical measure of pipelines' cost experience. Order No. 561, at 30,951–52. The data analyses conducted by Kahn and Means recommended the PPI–1% based on its ability to track a pipeline's aggregate costs; the index would not have the same relationship to a selected portion of the pipeline's inflation-driven costs. *Id.* Simply put, the PPI–1% only works as an indexing formula for overall pipeline rates because it applies to costs that are relatively unaffected by inflation as well as to inflation-driven costs. Second, the Commission concluded, without contradiction by Total, that selective indexing would also be more "complex and difficult to administer," necessitating additional regulatory work to identify, distinguish and monitor those pipeline costs. *Id.* at 30,592.

Third, the Commission expressed concern that selective indexing could create perverse incentives for pipelines to shift investments into inflation-adjusted accounts or reduce their capital investments in pipelines.[26] *Id.* Although Total correctly notes that selective indexing would not create incentives for cost-shifting if the inflation-driven costs were determined as an initial base rate, the Commission assumed that Total's proposal would involve year-by-year adjustment based on changes in each pipeline's cost structure. In any event, Total offers no evidence to support its claim that pipelines would continue to undertake capital investments under selective indexing because depreciation would be sufficient to cover most future capital expen-

**24.** Although AOPL contends that *Buckeye* also applied a GDP–IPD rate cap to non-competitive markets, the Commission in fact required that any rate changes in competitive markets be matched by corresponding changes in non-competitive markets. 53 F.E.R.C. ¶ 61,473, at 62,-675, 62,683.

**25.** As intervenor in No. 94–1644 (Total's appeal), AOPL maintains that Total has not even identified the ratemaking principles on which it relies much less provided supporting analysis for the assumptions reflected in its model of pipeline costs and revenues. We share AOPL's concerns about the unsupported nature of Total's selective indexing proposal, but need not address whether Total's proposal was inadequate in itself because the Commission engaged in reasoned decision making in rejecting it.

**26.** Total maintains that the Commission's discussion of capital investment is inconsistent with its earlier policy statement, *Incentive Ratemaking for Interstate Natural Gas Pipelines, Oil Pipelines, and Electric Utilities,* 61 F.E.R.C. ¶ 61,168 (1992), *reh'g denied,* 63 F.E.R.C. ¶ 61,110 (1993). In the policy statement, the Commission announced that it would work toward introducing ratemaking methodologies that would "foster long-run productive efficiency" by "divorcing rates from the underlying cost-of-service." 61 F.E.R.C. ¶ 61,168, at 61,588. The indexing method adopted for oil pipelines in Order No. 561 is an example of what the policy statement calls "automatic rate adjustment mechanisms." *Id.* at 61,590–92. In the policy statement, the Commission also announced its intention to make sure that under incentive ratemaking "quality of service" is "maintained or enhanced." *Id.* at 61,590. Contrary to Total's contentions, there is no contradiction between the policy statement and Order No. 561, in which the Commission specifically rejected Total's proposal of selective indexing on the ground that reduction in capital investment might lead to a lower quality of service. Order No. 561, at 30,952.

ditures and capital expansion would be self-funding.[27]

Further, even if Total were correct that over time the PPI–1% will result in an overly generous price cap, the Commission has announced that it will conduct a general review of the index formula after five years' experience. Order No. 561, at 30,952. Total contends that the Commission erred by not adopting a periodic review of the costs for individual pipelines. As opposed to the "rigid sharing" aspect of the Commission's approach, which Total characterizes as allowing a pipeline to retain any productivity gains it makes beyond a one-percent productivity offset, Total advocates a "flexible sharing" approach, in which the individual pipeline's costs are periodically compared to its rates to ensure that customers are sharing in the productivity gains. *Cf. National Rural Telecom Ass'n v. FCC,* 988 F.2d 174, 183 (D.C.Cir.1993) (describing the "sharing rule" under the Federal Communication Commission's price-cap regulation for telephone service). Total misconceives the nature of the PPI–1% index. As explained, the Commission did not adopt a productivity offset, and it chose the PPI–1% formula as the closest measure in itself of past cost changes. Order No. 561, at 30,951. As there was no evidence in the record of productivity gains for oil pipelines, the Commission's decision not to adopt a productivity offset was reasonable.[28] *Cf. Time Warner,* 56 F.3d at 173 (upholding the Federal Communication Commission's price-cap regulation for cable television service despite the lack of a productivity offset, in the absence of evidence of productivity gains in the industry). Hence, the Commission's decision not to undertake periodic review of individual-pipeline costs was also justified.

The Commission has instead guarded against an individual pipeline's charging excessive rates, relative to costs, by different means. Rather than reviewing the PPI–1% index formula for individual pipelines, the Commission has adopted protest and complaint procedures that allow shippers to challenge excessive rates. Whenever a shipper can show that a pipeline's "rate increase is so substantially in excess of the actual cost increases incurred by the carrier that the rate is unjust or unreasonable," 18 C.F.R. § 343.2(c)(1), the shipper may complain against an existing rate or protest a rate change. Total has not explained why the Commission's decision to combine a periodic general review of the industry-wide rate formula with procedures for challenges to individual pipeline rates is unreasonable.

In sum, we conclude that the contentions by the AOPL and Total petitioners represent, in essence, disagreements among competing reasonable options, and they fail to show that the Commission's findings lacked substantial evidence. Accordingly, because the Commission's conclusion reasonably flows from the evidence, and in the realm of rate-making expertise the Commission's decision necessitates complex policy choices, the court has no occasion to second guess the Commission's "choice between two fairly conflicting views." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951); *see also Permian Basin,* 390 U.S. at 790–92, 88 S.Ct. at 1372–73; *Time Warner,* 56 F.3d at 163; *Computer & Communications Indus. Ass'n v. FCC,* 693 F.2d 198, 218–19 (D.C.Cir.1982), *cert. denied,* 461 U.S. 938, 103 S.Ct. 2109, 77 L.Ed.2d 313 (1983).

**IV.**

██ **Automatic rate decrease mechanism.** More problematic is AOPL's challenge to the automatic rate-decrease mech-

---

27. The only evidence Total identifies is the small number of oil pipeline rate adjudications over the last few years. *See* Order No. 561, at 30,976 n. 5 (Hoecker, Comm'r, concurring in part and dissenting in part). Not only are there many causes for that, but Total offers no reason to make the inference from pipelines' past ability to recover capital investments under cost-based rates to a future ability to recover those costs under indexed rates.

28. Total contends as well that Order No. 561 is inconsistent with the policy statement on incentive ratemaking, in which the Commission appeared to envision periodic review of the relation between individual pipelines' rates and costs. 61 F.E.R.C. ¶ 61,168, at 61,590–92. Yet as the Commission points out, the policy statement discussed voluntary incentive ratemaking based on filings by individual pipelines, rather than an industry-wide cap.

anism. The rate orders mandate annual adjustments to a pipeline's indexed rate ceiling, in accordance with changes of the PPI–1%. Order 561, at 30,953; Order 561–A, at 31,099. In any year in which the index reflects price deflation, and therefore is negative, it has the effect of lowering pipelines' indexed rate ceilings. Pipelines with rates above the new ceiling "must file a new tariff to bring that rate into compliance with the new ceiling." Order No. 561–A at 31,099; *see also* 18 C.F.R. § 342.3(e). Insofar as the PPI–1% declined twice during the twenty-five years since 1970, falling to a negative 2.4% in 1986,[29] and a negative .3585% in 1993,[30] AOPL's challenge is not academic.[31] We therefore address AOPL's contentions.

First, AOPL's contention that the Commission arbitrarily adopted "inconsistent" analyses concerning the legal status of indexed rates is without basis. AOPL maintains that the Commission's willingness to allow protests to properly indexed rate increases on the ground that the increase might not be "just and reasonable" cannot be reconciled with its requirement that pipelines automatically decrease rates above the index ceiling because they are not "just and reasonable." The Commission announced in its order on rehearing that the rate decrease mechanism

was premised on the Commission's "rebuttable finding" that "a rate level in excess of the ceiling established by the PPI–1 index is presumptively unjust and unreasonable." Order 561–A, at 31,101. Hence, there is no basis for AOPL's suggestion that the Commission would have to dismiss summarily any protest alleging that a rate increase within the applicable ceiling levels exceeds just and reasonable rates.[32] Rather, the protestor has the opportunity to show, for example, that because of a reduction in costs, the indexed rate greatly exceeds what would be fair and just. Order No. 561, at 30,955; Order 561–A, at 31,102.

■ Second, AOPL's challenge to the Commission's authority to order automatic rate decreases without affording an individualized hearing as to the existing rate's continued justness and reasonableness, is, ultimately, unpersuasive. Section 15(1) of the ICA authorizes the Commission to modify existing rates after "full hearing, upon a complaint ..., or after full hearing under an order for investigation and hearing made by the Commission on its own initiative."[33] AOPL maintains, therefore, that § 15(1) requires the Commission to hold individual hearings before reducing a pipeline's existing indexed rate.[34]

29. *See* AOPL Comments on Staff Proposal 18 (May 3, 1993); Buckeye Pipe Line Co., L.P., Comments on Staff Proposal 26 tbl. 4 (May 3, 1993).

30. *See* Revisions to Oil Pipeline Regulations Pursuant to the Energy Policy Act of 1992, F.E.R.C. Stats. & Regs. (CCH) ¶ 35,027 (May 19, 1995), 60 Fed.Reg. 27,727 (May 25, 1995).

31. *See* Steven Reed & Pantelis Michalopoulos, *Oil Pipeline Regulatory Reform: Still in the Labyrinth?*, 16 ENERGY L.J. 65, 82 n. 100 (1995) (observing that "the obligation to decrease rates under indexing" is "[f]ar from being a remote eventuality").

32. Contrary to AOPL's view, *Arizona Grocery Co. v. Atchison, T. & S.F. Ry.*, 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348 (1932), holds only that the Commission may not retroactively declare unlawful rates that it had previously "conclusively determin[ed]" were just and reasonable. By contrast, in the instant case the Commission has merely made a presumptive finding of lawfulness, and any departure from the indexed rate will have only prospective effect.

33. ICA § 15(1) provides in relevant part:

Whenever, after full hearing, upon a complaint ..., or after full hearing under an order for investigation and hearing made by the Commission on its own initiative, ... the Commission shall be of opinion that any ... rate ... is or will be unjust or unreasonable ..., the Commission is authorized and empowered to determine and prescribe what will be the just and reasonable ... rate ... to be thereafter observed in such case, or the maximum or minimum ... to be charged, ... and to make an order that the carrier or carriers shall cease and desist from such violation....

34. The Commission's position that AOPL has waived its "full hearing" argument by failing to raise it before the Commission, *United Transp. Union v. ICC*, 43 F.3d 697, 701 (D.C.Cir.1995), is not well taken. Because the Commission considered the issue on the merits, *see* Order No. 561–A, at 31,102, the requirement of exhaustion is excused. *See Natural Resources Defense Council*, 824 F.2d at 1151.

Under the Commission's interpretation of § 15(1), however, it has no obligation to conduct individualized pipeline hearings. Instead, the Commission construes the hearing requirement for existing rates in § 15(1) and for proposed rates in § 15(7) to be satisfied by the notice and comment procedures of the instant rulemaking, in which all interested persons have had an opportunity to be heard. Order No. 561–A, at 31,102. Thus, the Commission maintains that under § 15(1) it is authorized to regulate pipeline rates through the promulgation of rules of general applicability, as opposed to the issuance of orders through case-specific adjudication.

In support of its interpretation, the Commission relies on *Heckler v. Campbell,* 461 U.S. 458, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983). Order 561–A, at 31,102 n. 33. In that case the Supreme Court rejected a challenge to the use by the Secretary of Health, Education and Welfare of medical-vocational guidelines for determining disability benefits as inconsistent with the requirement in the Social Security Act for individualized hearings. 461 U.S. at 467, 103 S.Ct. at 1957. Acknowledging that "the statutory scheme contemplate[d] ... individualized determinations based on evidence adduced at a hearing," the Court concluded that the Secretary was nevertheless not barred "from relying on rulemaking to resolve certain classes of issues." *Id.* The Court noted that the Secretary had statutory rulemaking authority, *id.* at 466, 103 S.Ct. at 1956–57, and that the regulations allowed claimants to rebut the application of the guidelines in their individual cases, *id.* at 467–68 & n. 11, 103 S.Ct. at 1957 & n. 11.

The Commission's interpretation is consistent with prior agency interpretations sanctioned by the Supreme Court in the context of other regulatory schemes. *See American Hosp. Ass'n v. NLRB,* 499 U.S. 606, 609–14,

111 S.Ct. 1539, 1541–44, 113 L.Ed.2d 675 (1991); *FPC v. Texaco, Inc.,* 377 U.S. 33, 41–44, 84 S.Ct. 1105, 1110–12, 12 L.Ed.2d 112 (1964); *United States v. Storer Broadcasting Co.,* 351 U.S. 192, 205, 76 S.Ct. 763, 771, 100 L.Ed. 1081 (1956). The Commission has the requisite rulemaking authority under EPAct § 1801.[35] As in *Heckler v. Campbell,* the Commission established a general rule that will allow the recovery of normal costs, Order No. 561–A, at 31,099, while still allowing for individualized determination whenever a pipeline makes a showing that a factual determination is required as to the justness and reasonableness of the rates. *Id.* at 31,102.

■ Under the familiar analysis set forth in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984), where an agency is applying a statute entrusted by Congress to its administration, the court "must give effect to the unambiguously expressed intent of Congress." *Id.* at 843, 104 S.Ct. at 2781. Because Congress has provided no instruction as to how the Commission shall conduct a "full hearing" under § 15(1), and it has not spoken as to whether an individualized hearing is required,[36] the only question is whether the Commission's interpretation of the statute is "reasonable and consistent with the statute's purpose." *Chemical Mfrs. Ass'n v. EPA,* 919 F.2d 158, 162–63 (D.C.Cir.1990). As the Commission observed, AOPL's interpretation of "full hearing" is difficult to square with the EPAct's mandate that the Commission "shall issue a final rule which establishes a simplified and generally applicable ratemaking methodology." EPAct § 1801(a). We conclude that the Commission's interpretation of § 15(1) is a permissible one. *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2781–82.

35. We need not decide whether the Commission has general rulemaking authority under § 12(1). *See Association of American Railroads v. ICC,* 600 F.2d 989, 994–95 (D.C.Cir.1979) (describing the argument in favor of rulemaking authority as "not without force" but leaving the issue open); *cf. American Trucking Ass'ns v. United States,* 344 U.S. 298, 311, 73 S.Ct. 307, 315, 97 L.Ed. 337 (1953).

36. AOPL's reliance on dictum in *ICC v. Louisville & N. R.R.,* 227 U.S. 88, 91, 33 S.Ct. 185, 186–87, 57 L.Ed. 431 (1913), is misplaced because the Supreme Court spoke only to the scope of a hearing under § 15, and the Court has since distinguished *Louisville* as applying only to individualized adjudications. *United States v. Florida East Coast Ry.,* 410 U.S. 224, 244, 93 S.Ct. 810, 820–21, 35 L.Ed.2d 223 (1973).

Third, AOPL misconceives what the statute requires in contending that the Commission exceeded its authority by prescribing rate changes where it has merely made a "rebuttable finding" as to a rate's unlawfulness. AOPL maintains that the Commission's presumptive finding is insufficiently definitive and final to satisfy the procedure requirement of ICA § 15(1). But § 15(1) does not require the Commission to make an irrebuttable finding prior to ordering a rate change. Instead, the Commission has authority to prescribe rate changes whenever it "shall be of the opinion" that a rate is unjust or unreasonable. ICA § 15(1). Moreover, the statute expressly contemplates that proposed rates are subject to challenge by complaint. *See* ICA § 13(1). Therefore, the court has no occasion to assign a meaning to the statute where that meaning would contravene a reasonable interpretation by the agency responsible for administering the statute. *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2781–82. The Commission simply found that a rate falling below the index ceiling ordinarily will be just and reasonable, but under limited circumstances such rates may be subject to successful challenge. Order No. 561, at 30,955; Order No. 561–A, at 31,102–03. Likewise, rates falling outside of the index, the Commission found, were "presumptively unjust and unreasonable," Order 561–A, at 31,101, and to obtain permission to charge such rates, a pipeline must either demonstrate the need for cost-based rates or obtain a waiver from the indexing system based on lack of market power. Order No. 561, at 30,947. AOPL does not contend that the Commission lacks authority to adopt an indexing method for determining rates, while allowing departures in some circumstances. Consequently, beyond the label, the difference between the Commission's "rebuttable" and "presumptive" findings on the rate index and other findings that the Commission makes regarding a traditional rate eludes us: both types of findings are "rebuttable" through the ICA's petition and protest procedures. *Cf. Permian Basin,* 390 U.S. at 764, 771–72, 88 S.Ct. at 1357–58, 1362–63.

Fourth, AOPL's contention that the rate decrease mechanism effectively imposes a periodic rate filing requirement and thereby improperly shifts the burden of proof under the ICA is no more persuasive. AOPL maintains that the rate decrease mechanism eliminates the distinction between a pipeline's voluntary rate filings under § 15(7) of the ICA, where "the burden of proof shall be upon the carrier to show that the proposed changed rate ... is just and reasonable," and a shipper complaint against or Commission investigation of an existing rate under § 15(1), where either the complainant or the Commission bears the burden of demonstrating that a rate is unjust or unreasonable.

AOPL's reliance on *Kuparuk Transportation Co.,* 55 F.E.R.C. ¶ 61,122, 1991 WL 265676 (1991), and *Public Service Commission of New York v. FERC,* 866 F.2d 487 (D.C.Cir.1989) is misplaced in light of the fact that these cases involved attempts to impose a periodic rate filing requirement without a finding by the Commission that the existing rate was unlawful. In *Public Service Commission,* the court held that the Commission could not circumvent the statutory distinction between §§ 4 and 5 of the Natural Gas Act (NGA), 15 U.S.C. §§ 717c–717d, *see Northern Natural Gas Co. v. FERC,* 827 F.2d 779 (D.C.Cir.1987) (en banc), by relying on § 16 of the NGA, 15 U.S.C. § 717o, to establish a periodic refiling requirement under which the natural gas pipeline would bear the burden of proof. 866 F.2d at 490–91. In *Kuparuk,* the Commission held that §§ 15(7) and 15(1) of the ICA were analogous to §§ 4 and 5 of the NGA, and that the Commission lacked the authority to require an oil pipeline to make a periodic rate filing. 55 F.E.R.C. ¶ 61,122, at 61,367. Unlike the periodic filing requirements in *Public Service Commission* and *Kuparuk,* the automatic rate decrease provision of the Commission's indexing system does not circumvent the ICA's burden-of-proof scheme. In the operation of the automatic rate decrease mechanism, the existing rate that the pipeline must withdraw has already been found to be unjust and unreasonable because it exceeds the index ceiling. Order No. 561–A, at 31,101–02. Properly understood, the automatic rate decrease mechanism is simply a lawful exercise of the Commission's author-

ity under § 15(1) to proscribe unjust and unreasonable rates.

## V.

■ **A. Cost-based rates.** AOPL makes two challenges to the filing requirements for cost-based rates set forth in Order No. 571. A pipeline filing for cost-of-service rates must provide various statements and supporting work papers necessary to enable the Commission to make an Opinion No. 154–B determination. 18 C.F.R. §§ 346.1(c), 346.2; Order No. 571–A, at 31,252. First, AOPL contends that the Commission has imposed unduly burdensome initial filing requirements on pipelines beyond the Commission's limited authority under § 6(3). Second, AOPL contends that the cost-based procedures are so burdensome and complex that they violate the statutory streamlining mandate in EPAct § 1802. We find neither challenge to the procedures for cost-based rates persuasive.

AOPL maintains that the Commission may impose only those filing requirements authorized by § 6(3). Section 6(3) provides in relevant part:

> No change shall be made in the rates ... which have been filed and published by any common carrier in compliance with the requirements of this section, except after thirty days' notice to the Commission and to the public ...: *Provided further,* That the Commission is authorized to make suitable rules and regulations for the simplification of schedules of rates ... and to permit in such rules and regulations the filing of an amendment of or change in any rate ... without filing complete schedules covering rates ... not changed if, in its judgment, not inconsistent with the public interest.

The Commission, however, reasonably interprets § 6(3) to be "no more than a specification of the form that a notice of a proposed change in rates must take," and not, as AOPL maintains, a restriction on the Commission's power to establish initial filing requirements. Order No. 571–A, at 31,252. Indeed, it is difficult to understand how

AOPL reads § 6(3), which prohibits carriers from altering their own rates without giving thirty days' notice, as a restriction on the Commission's authority. Rather, the Commission's authority to establish rate filing requirements is found in § 12(1), which authorizes the Commission to "obtain from such carriers and persons such information as the Commission deems necessary to carry out the provisions of this chapter." AOPL nowhere explains why the Commission's § 12(1) authority to obtain information does not support the cost-of-service filing requirements.[37] Moreover, in a similar case under the Federal Power Act, the court upheld the Commission's authority to reject filings not in compliance with substantive Commission regulations. *Municipal Light Bds. v. FPC,* 450 F.2d 1341, 1345–47 (D.C.Cir.1971), *cert. denied,* 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972).

AOPL's second contention is that the cost-of-service filing requirements violate the congressional mandate that "the Commission shall issue a final rule to streamline procedures of the Commission relating to oil pipeline rates in order to avoid unnecessary regulatory costs and delays." EPAct § 1802(a). The Commission was specifically instructed to consider the "[i]dentification of information to be filed with an oil pipeline tariff." *Id.* § 1802(b)(1). According to AOPL, the requirement that a pipeline file supporting materials before it is known whether its proposed cost-based rate will be challenged is not a "streamlined" procedure. The Commission explained that the filing procedures "require[ ] only that data necessary for a pipeline to show whether there is a substantial divergence between its cost of service and revenues at the index ceiling rate and thus whether it warrants an exception to indexing." Order No. 571–A, at 31,253. As Total points out as intervenor in No. 95–1051, the cost-of-service filing requirements will streamline the process for shippers, who otherwise would have had to protest cost-based rates without the benefit of supporting data.

**37.** AOPL focuses on the independent clause in § 12(1) providing that "[t]he Commission is authorized and required to execute and enforce the provisions of this chapter," and argues that that clause provides no duties or obligations not

found in other statutory provisions. Because we do not rely on § 12(1)'s "execute and enforce" provision, we need not address the scope of the Commission's power thereunder. *Cf. Association of American Railroads,* 600 F.2d at 995.

Moreover, the Commission achieved a streamlining effect by making cost-of-service filings the exception, rather than the rule. We see no basis for setting aside the Commission's determination that the filing requirements in Order No. 571 will reduce costs and delays, in accordance with EPAct § 1802.

**B. Market-based rates.** AOPL also makes two statutory challenges to Order No. 572's procedural requirements for the institution of market-based rates. A pipeline cannot institute market-based rates until the Commission has completed its investigation into whether the pipeline possesses significant market power, similar to the *Buckeye* phase I proceeding. 18 C.F.R. §§ 348.1–348.2; Order No. 572, at 31,180–81.[38] First, AOPL contends that the Commission's market-based rate procedures, like the cost-of-service filing requirements, violate § 6(3) of the ICA. Second, AOPL contends that the Commission's market-based rate procedures violate § 15(7) of the ICA, which provide that a pipeline's filed rates go into effect automatically if the Commission has not declared them unlawful within seven months.

AOPL's § 6(3) claim is no more persuasive with regard to the market-based rate procedures than it was for the cost-based rate procedures. The Commission not only relied on its § 12(1) authority, Order No. 572, at 31,182 (cross-referencing discussion in Order No. 571), but also stated that the market-based procedures are a "waiver request" rather than a "rate filing." *Id.* We need not reach this further basis for the Commission's authority because we conclude that AOPL's § 6(3) challenge to the market-based rate procedures fails for the same reason as its

§ 6(3) challenge to the cost-of-service filing requirements.

Neither do the Commission's market-based rate filing requirements violate § 15(7), which mandates that a pipeline's filed rates go into effect automatically if the Commission has not declared them unlawful within seven months.[39] The Commission's market-based rate procedures do not permit a pipeline to charge market-based rates until the Commission has concluded that the pipeline lacks significant market power in the relevant markets. *See* Order No. 572 at 31,181. Because the Commission's market power determinations have previously taken years to complete, AOPL argued to the Commission that it has effectively authorized an indefinite suspension authority over a filed rate contrary to § 15(7).

The Commission reasonably takes the position, however, that a pipeline's application for market-based rates is not subject to § 15(7)'s procedural constraints because the market power determination is not a rate filing, but rather "[i]t merely can lead to such a filing." Order No. 572–A, at 62,500. Insofar as the Commission has found rates above the index ceiling presumptively unlawful and has imposed "a moratorium on filings for market based rates (except under the application process)," Order No. 572, at 31,181, it treats a pipeline's market-based rate application not as a § 15(7) rate filing, but as "a request for waiver of the maximum rate." Order No. 572, at 31,181.

The Commission relies on *Permian Basin* for the proposition that a prohibition on the filing of rates is lawful, particularly where the Commission has provided that a pipeline

---

38. The Commission acknowledged that market-based rates were treated differently from cost-based rates, in that a pipeline may institute a cost-of-service filing immediately, subject only to the Commission's § 15(7) suspension and refund power. But the Commission relied on *Farmers Union II* for the proposition that it lacked the authority to permit market-based rates for pipelines that did exercise market power. Order No. 572, at 31,181. The Commission also stated that a pipeline may, during the pendency of an investigation into market power, file for cost-based rates above the index ceiling. Order No. 561, at 30,947.

39. Section 15(7) provides in relevant part:

Whenever there shall be filed with the Commission any schedule stating a new ... rate ..., the Commission shall have, and it is given, authority, either upon complaint or upon its own initiative without complaint, ... to enter upon a hearing concerning the lawfulness of such rate ...; and pending such hearing and the decision thereon the Commission ... may from time to time suspend the operation of such schedule and defer the use of such rate ..., but not for a longer period than seven months beyond the time when it would otherwise go into effect. ...

may file market-based rates once it establishes that it lacks market power. In *Permian Basin*, the Commission prescribed "area maximum rates" under § 5(a) of the NGA that it found to be "just and reasonable" and imposed a two and one-half year moratorium on pipeline filings under § 4(d) for rates above the area maximum rate. The Supreme Court rejected the argument that the five-month limit on the Commission's authority to suspend pipeline-filed rates under § 4(e) of the NGA applied to Commission-prescribed rates under § 5(a).[40] 390 U.S. at 777–81, 88 S.Ct. at 1356–67. The *Permian Basin* Court reasoned that "[n]othing in § 5(a) imposes limitations of time upon the effectiveness of rate determinations issued under it; rather, the section provides that rates held to be just and reasonable are 'to be thereafter observed....'" *Id.* at 779, 88 S.Ct. at 1366. By analogy to the ICA, in which § 15(1) is equivalent to § 5(a) of the NGA and § 15(7) is equivalent to § 4(e) of the NGA, the seven-month limit on the Commission's suspension power under § 15(7) does not apply to a prohibition on changes from Commission-established "just and reasonable rates." Without doubt, there are limits to the Commission's ability to prohibit the filing of rates by oil pipelines. In *Permian Basin*, the Court noted that the Commission had found that the costs of gas production would be "remarkably steady" during the "relatively brief" moratorium period, and consequently declared: "We need not attempt to prescribe the limitations of the Commission's authority under §§ 5 and 16 to impose moratoria upon § 4(d) filings; in particular, we intimate no views on the propriety of moratoria created in circumstances of changing costs." 390 U.S. at 781, 88 S.Ct. at 1367.

Fortunately, we need not demarcate the limits of the Commission's authority to prohibit pipeline rate filings because pipelines retain the ability to file for just and reasonable rates under the Commission's indexing scheme. Although the pipeline may not implement market-based rates until the Commission has concluded its market-power investigation, the pipeline may file for cost-based rates. Order No. 561, at 30,947. As the Commission points out, "[a]n oil pipeline has no right to charge market-based rates." Order No. 572, at 31,181. Rather, the pipeline has the right only to recover just and reasonable rates, and the Commission's cost-based rate procedures provide the pipeline with that opportunity. Hence, the Commission reasonably describes the market-based rate procedures not as a rate filing but as a request for a waiver from the indexing system. Order No. 572, at 31,181; Order No. 572–A, at 62,500. Indeed, given that the Commission could have designed an indexing scheme without a market-based rate alternative, the Commission's decision that pipelines cannot file for market-based rates until the Commission has made a threshold market-power determination can hardly violate § 15(7). Accordingly, we conclude that a pipeline's application for market-based rates is not a rate filing that triggers the procedural requirements of § 15(7).

**C.  Protest and Complaint Procedures.** Total makes two challenges to the Commission's procedures announced in Order No. 561, first on the basis that the protest procedures improperly shift the burden of showing the reasonableness of a rate increase from the pipeline to the shipper, and second, on the ground that by limiting the scope of its review of complaints and protests against indexed rates, the Commission has abdicated its responsibility to ensure that rates are just and reasonable. Notwithstanding concerns expressed by two Commissioners about the effectiveness and clarity of the protest and

---

**40.**  Section 4(e) of the NGA, 15 U.S.C. § 717c(e), provides that:

> Whenever any such new schedule is filed the Commission shall have authority ... to enter upon a hearing concerning the lawfulness of such rate ...; and, pending such hearing and the decision thereon, the Commission ... may suspend the operation of such schedule and defer the use of such rate ..., but not for a longer period than five months beyond the

time when it would otherwise go into effect....

Section 5(a) of the NGA, 15 U.S.C. § 717d(a), provides that:

> Whenever the Commission, after a hearing had upon its own motion or upon complaint ..., shall find that any rate ... is unjust [or] unreasonable, ... the Commission shall determine the just and reasonable rate ..., and shall fix the same by order....

complaint proceedings,[41] we find Total's burden-shifting challenge unpersuasive. Likewise, we also find unpersuasive its challenge to the scheme adopted by the Commission.

■ First, the Commission's newly adopted protest procedures are consistent with § 15(7)'s burden-of-proof allocation. *See* Order No. 561–A, at 31,104. Whereas a shipper bears the burden of proof in a § 13(1) complaint against an existing rate, the pipeline bears the burden of proof when a shipper protests the pipeline's proposed rate increase under § 15(7). Under the rules announced in Order No. 561, the § 15(7) protest mechanism is available even where a rate increase complies with the applicable rate maximum. Order No. 561, at 30,955–56. A protester must "allege reasonable grounds for asserting ... that the rate increase is so substantially in excess of the actual cost increases incurred by the carrier that the rate is unjust and unreasonable." 18 C.F.R. § 343.2(c)(1); *see* Order No. 561, at 30,955–56; Order No. 561–A, at 31,103–04. This standard, adopted by the Commission in response to concerns about the limited information available to protestants through the pipelines' indexing filings, simply "requires an articulation of th[e] basis" that the protestant has for challenging the proposed rate increase. Order No. 561, at 30,965. The Commission's orders make clear that it intends this "reasonable grounds" standard to serve as a burden of production: [42]

> These procedures merely specify, in advance and with general applicability, what showing pipelines must make to put forth a *prima facie* case justifying a rate change under the indexing system, and what showing a protestant must make to rebut that case. There is no shifting of the ultimate burden on the pipeline to justify a rate change.

*Id.* The Commission's assurance that the rules under review respect the burden-of-proof allocation in § 15(7) protests satisfies us at this juncture. Of course, judicial review remains available to any protestant who believes that the Commission has improperly shifted the burden of proof in a specific § 15(7) protest.

■ Second, Total maintains that the Commission has abdicated its statutory obligation to ensure that the overall rates charged by pipelines are "just and reasonable," ICA § 1(5), by limiting the scope of its review with respect to complaints and protests filed by shippers against indexed rates, to the incremental change in pipeline costs and rates since October 24, 1992, the date that EPAct § 1803(a) declared then-existing rates to be just and reasonable. *See* Order No. 561, at 30,952–53 ("[S]uch protests must show that the increment of the rate change produced by application of the index is substantially in excess of the individual pipeline's increase in costs."). In Total's view, such a limited scope of review impedes the Commission's task of assuring that rates, in their entirety, will be just and reasonable.

Congress provided expressly, however, that "[n]o person may file a complaint under section 13" against a base rate declared to be "just and reasonable" under EPAct § 1803(a), unless

> evidence is presented to the Commission which establishes that a substantial change has occurred after [October 24, 1992]—
>
> (A) in the economic circumstances of the oil pipeline which were a basis for the rate; or
>
> (B) in the nature of the services which were a basis for the rate[.]

---

**41.** Commissioners Hoecker and Massey feared that protesting shippers would lack the requisite information upon which to base a challenge to incremental rate changes. Order No. 561, at 30,977–2 to 30,977–3 (Hoecker, Comm'r, concurring in part and dissenting in part); *id.* at 30,977–5 (Massey, Comm'r, dissenting).

**42.** In its brief to the court, the Commission describes the "reasonable grounds" requirement for protestants as "the equivalent of a pleading rule." Brief for Respondent at 73. Total has

called to the court's attention a case in which the Commission demonstrably did not treat the "reasonable grounds" requirement as a pleading rule but required the complainant to produce some evidence. *See Santee Distributing Co. v. Dixie Pipeline Co.*, 71 F.E.R.C. ¶ 61,205, at 61,755 (1995). In any event, the Commission's argument on brief is inconsistent with its formulation of the "reasonable grounds" requirement in the orders on review.

---

---

---

EPAct § 1803(b)(1). As the Commission pointed out, "[t]o allow the protestant of a proposed increase of a statutorily protected underlying rate to challenge the whole rate, and not just the proposed increase, would be to remove the protection of section 1803(a) solely on account of the filing of a proposal to effect a modification of that rate." Order No. 561–A, at 31,104. If the Commission were free to examine whether the overall rate is just and reasonable, then the pipeline would forfeit the "grandfathering" provision of EPAct § 1803(a) as soon as it took advantage of the indexing provisions of Order No. 561. The Commission's reading of EPAct § 1803 to preclude later re-examination of the underlying rate is a reasonable one. Contrary to Total's assertions, the Commission's scheme complies with § 1(5)'s requirement of "just and reasonable rates" because the "grandfathered" rates are by definition "just and reasonable" except for the specific exceptions in EPAct § 1803(b).

In conclusion, consistent with the limited scope of our inquiry, we conclude that, particularly in light of the protest and complaint procedures, as well as the provision for cost-based and market-based alternatives to the general indexing scheme, petitioners fail to show that the Commission has not ensured that oil pipeline rates are just and reasonable. Moreover, the Commission has stated that if the PPI–1% does not track pipeline costs as closely as anticipated, it will review its choice of index in five years and make appropriate adjustments. Order No. 561–A, at 31,093. The Commission's design of the ratemaking scheme and selection of the PPI–1% formula was a complex process, involving many competing concerns and policy choices. As the Commission readily acknowledges, there is no perfect index that will track all pipeline cost changes. Order No. 561–A, at 31,096. The record shows, however, that the Commission has adhered responsibly to its dual responsibilities under the EPAct and the ICA and rationally exercised its ratemaking authority. *See State Farm,* 463 U.S. at 43, 103 S.Ct. at 2866–67. Because the Commission's analysis required a high level of technical expertise, the court owes deference to the Commission's informed and rationally exercised discretion.

*See Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 377, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377 (1989). "[R]ate-making agencies are not bound to the service of any single regulatory formula; they are permitted, unless their statutory authority otherwise plainly indicates, to make the pragmatic adjustments which may be called for by particular circumstances." *Permian Basin,* 390 U.S. at 776–77, 88 S.Ct. at 1365 (quotation omitted). Accordingly, we deny the petitions for review.