# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 12, 2017    Decided November 28, 2017

No. 16-1059

ASSOCIATION OF OIL PIPE LINES,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

AIR TRANSPORT ASSOCIATION OF AMERICA, INC., D/B/A
AIRLINES FOR AMERICA, ET AL.,
INTERVENORS

———

On Petition for Review of an Order of
the Federal Energy Regulatory Commission

———

*Steven Reed* argued the cause for petitioner. With him on
the briefs were *Steven H. Brose*, *Daniel J. Poynor*, and *Steven
M. Kramer*.

*Susanna Y. Chu*, Attorney, Federal Energy Regulatory
Commission, argued the cause for respondents. With her on
the brief were *James J. Fredricks* and *Robert J. Wiggers*,
Attorneys, U.S. Department of Justice, *Robert H. Solomon*,

Solicitor, Federal Energy Regulatory Commission, and *Beth G. Pacella*, Deputy Solicitor.

*Richard E. Powers Jr.*, *Steven A. Adducci*, *Matthew D. Field*, *Thomas J. Eastment*, *Gregory S. Wagner*, *David A. Berg*, *Jeffrey M. Petrash*, and *James H. Holt* were on the brief for Shippers Intervenors in support of the Federal Energy Regulatory Commission.

Before: KAVANAUGH and SRINIVASAN, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: Pursuant to authority granted to it under the Interstate Commerce Act, 49 U.S.C. app. § 15(1) (1988), and the Energy Policy Act of 1992, Pub. L. No. 102-486, § 1801(a), 106 Stat. 2776, 3010 (codified at 42 U.S.C. § 7172 note (2006)), the Federal Energy Regulatory Commission ("FERC" or "Commission") employs an indexed ratemaking system to govern oil pipeline rates. *See* Order No. 561, *Revisions to Oil Pipeline Regulations Pursuant to the Energy Policy Act of 1992*, 58 Fed. Reg. 58,753, 58,753-54 (Nov. 4, 1993). The Commission calculates the index each year using a formula aimed at capturing the change in costs experienced by the oil pipeline industry. *Id.* at 58,754. It reexamines the formula it utilizes to set the annual index every five years. *Id.* With limited exceptions, it has applied a generally consistent methodology, approved by this court, to calculate the change in normal industry costs at each five-year interval. *See Ass'n of Oil Pipe Lines v. FERC* (*AOPL I*), 83 F.3d 1424 (D.C. Cir. 1996).

On December 17, 2015, after engaging in notice and comment rulemaking, the Commission issued an order adopting the index formula for the 2016 to 2021 period. *Five-Year Review of the Oil Pipeline Index*, 80 Fed. Reg. 81,744 (Dec. 31, 2015) [hereinafter 2015 Order]. The Association of Oil Pipelines ("AOPL") filed a petition for review of the 2015 Order in this court on February 16, 2016. AOPL alleges that the Commission acted arbitrarily and capriciously in violation of the Administrative Procedure Act ("APA") by departing in two ways from the methodology used in past index reviews: First, according to AOPL, FERC, without reasoned explanation, impermissibly relied solely on the middle 50 percent of pipeline cost-change data and failed to incorporate the middle 80 percent of cost-change data. Second, AOPL asserts that FERC, without adequate justification, impermissibly used "Page 700" cost-of-service data to calculate the index level instead of the "Form No. 6" accounting data that had been employed in the past. We find no merit in AOPL's claims.

Because "[t]he Commission, not this or any court, regulates" oil pipeline rates, our role on review of the 2015 Order is limited. *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 784 (2016). The record makes it plain that the Commission adequately and reasonably explained its decision not to consider the middle 80 percent of pipelines' cost-change data. Furthermore, contrary to AOPL's assertion, nothing in any of FERC's past index review orders bound the agency to use the middle 80 percent of pipelines' cost-change data. Likewise, the Commission's rationale for utilizing the cost-of-service data from Page 700 is clear and reasonable. And there is nothing in the record to support AOPL's claim that FERC's decision to use Page 700 data indicates an unexplained shift in its measurement objective. In this situation, the words of the Supreme Court are quite apt:

> The disputed question[s in this case involve] both technical understanding and policy judgment. . . . Our important but limited role is to ensure that the Commission engaged in reasoned decisionmaking—that it weighed competing views, selected [an index] with adequate support in the record, and intelligibly explained the reasons for making that choice. FERC satisfied that standard. . . . [T]he Commission met its duty of reasoned judgment. FERC took full account of the alternative policies proposed, and adequately supported and explained its decision.

*Id*. The conclusions reached by the Court in *FERC v. Electric Power Supply Association* apply here as well. We therefore deny the petition for review.

## I. Background

## A. Statutory and Regulatory History

Oil pipelines have long been subject to rate regulation under the Interstate Commerce Act. *See* Hepburn Act, Pub. L. No. 59-337, 34 Stat. 584 (1906). As currently codified, that statute charges FERC with ensuring that pipeline rates are "just and reasonable." 49 U.S.C. app. § 15(1) (1988). For many years, the Commission calculated rates using a cost-of-service methodology under which pipelines could recover "only a real (inflation-adjusted) rate of return each year." *AOPL I*, 83 F.3d at 1429; *see* Opinion No. 154-B, *Williams Pipe Line Co.*, 31 FERC ¶ 61,377 (June 28, 1985), *opinion on reh'g*, 33 FERC ¶ 61,327 (1985).

In 1992, Congress enacted the Energy Policy Act, which directed FERC to issue a rule to simplify the ratemaking methodology for oil pipelines. Energy Policy Act of 1992,

§ 1801(a), 106 Stat. at 3010. To fulfill its Energy Policy Act mandate, the Commission promulgated Order No. 561, adopting an indexed ratemaking system. *See* 58 Fed. Reg. at 58,754. Under this system, the Commission sets an annual index, which is used to calculate pipeline-specific rate ceilings; pipelines may increase their rates without seeking the Commission's approval, so long as the increase does not exceed the annual limit, computed using the index. 18 C.F.R. § 342.3(a), (d). The Commission also provided that, in limited circumstances, pipelines may increase their rates pursuant to three alternative methods. *Id.* § 342.4. Among these is a cost-of-service option, which allows a pipeline to file for an individualized rate based on its costs, as it would have under the previous methodology, if the pipeline shows there is a substantial divergence between the costs it experienced and the rate resulting from the index. *Id.* § 342.4(a).

Order No. 561 also established the formula the Commission would use to set the annual index. 58 Fed. Reg. at 58,757-60. The index formula is designed to "track[] the historical changes in the actual costs of the product pipeline industry." *Id.* at 58,760. The Commission determined to use the change in the Producer Price Index for Finished Goods ("PPI-FG"), as published by the U.S. Department of Labor, Bureau of Labor Statistics, as a baseline measure for inflation, adjusted to account for "actual cost changes experienced by the [oil pipeline] industry." *Id.*; *see also* 18 C.F.R. § 342.3(d)(2).

In formulating its methodology, the Commission relied on a proposal from Dr. Alfred Kahn, an industry commenter's expert. *See* Order No. 561-A, *Revisions to Oil Pipeline Regulations Pursuant to Energy Policy Act of 1992*, 59 Fed. Reg. 40,243, 40,245-46 (Aug. 8, 1994). Dr. Kahn calculated the annual rates of change for operating expenses for each pipeline based on accounting information obtained from part of

the pipelines' Form No. 6 annual regulatory filings. *See id.* at 40,247. He then omitted from his analysis the pipelines within the upper and lower 25 percent of the cost spectrum in order to exclude statistical outliers and incomplete or questionable data. *Id.* Applying the Kahn Methodology, the Commission considered the middle 50 percent of pipelines' cost-change data and adopted an initial index formula of PPI-FG minus 1.0 percent. *See id.*; Order No. 561, 58 Fed. Reg. at 58,760. The Commission additionally determined that consistent monitoring of the formula would be necessary to measure the index's continued capacity to accurately track cost changes in the pipeline industry, and it committed to revisit the formula every five years. *See* Order No. 561, 58 Fed. Reg. at 58,754. On review, this court upheld the Commission's index scheme in its entirety. *See AOPL I*, 83 F.3d at 1433, 1445.

In 2000, the Commission engaged in its first review of the index formula. After notice and comment, FERC elected to maintain the PPI-FG minus 1.0 percent formula, but used a different methodology than the one used in 1994. *Five-Year Review of Oil Pipeline Pricing Index*, 93 FERC ¶ 61,266, at 61,851-52 (Dec. 14, 2000) [hereinafter 2000 Order]. On review, this court held that the Commission had failed to articulate and adequately justify its reasons for shifting its methodology and remanded the case for further consideration by the agency. *See Ass'n of Oil Pipe Lines v. FERC* (*AOPL II*), 281 F.3d 239, 240-41 (D.C. Cir. 2002). On remand, FERC largely embraced the Kahn Methodology and adopted an index of PPI-FG with no adjustment. *Five-Year Review of Oil Pipeline Pricing Index*, 102 FERC ¶ 61,195, at 61,537, 61,539-41 (Feb. 24, 2003) [hereinafter 2003 Order]. This court rejected a challenge to the new order. *See Flying J Inc. v. FERC*, 363 F.3d 495, 500 (D.C. Cir. 2004).

In subsequent index reviews, the Commission continued to rely on the Kahn Methodology, but with some modifications. For example, in 2006, as it had in the 2003 Order, the Commission considered data from pipelines with cumulative per-barrel-mile cost changes in both the middle 50 percent and middle 80 percent of all oil pipelines. *See Order Establishing Index for Oil Price Change Ceiling Levels*, 114 FERC ¶ 61,293, at 62,038-40 (March 21, 2006) [hereinafter 2006 Order]; *see also* 2003 Order, 102 FERC at 61,540-41. In 2010, however, the Commission returned to its original approach of utilizing data within only the middle 50 percent. *Order Establishing Index for Oil Price Change Ceiling Levels*, 133 FERC ¶ 61,228, at 62,254-57 (Dec. 16, 2010) [hereinafter 2010 Order]. In each review, the Commission calculated the industry's costs using accounting data from various parts of pipelines' Form No. 6 filings. *See, e.g.*, 2006 Order, 114 FERC at 62,034, 62,045; 2010 Order, 133 FERC at 62,254.

## B. The 2015 Index Review

On June 30, 2015, the Commission issued a Notice of Inquiry for its fourth periodic reexamination of the index formula. Notice of Inquiry, *Five-Year Review of the Oil Pipeline Index*, 80 Fed. Reg. 39,010 (July 8, 2015). It proposed an index of PPI-FG plus between 2.0 percent and 2.4 percent and requested comment. *Id.* at 39,010-11. The Commission based the proposed adjustment on calculations made pursuant to the Kahn Methodology, which it described as measuring "changes in operating costs and capital costs on a per barrel-mile basis using FERC Form No. 6 . . . data from the prior five-year period . . . to establish the cumulative cost change for each pipeline . . . cull[ed] [to] a data set consisting of pipelines with cumulative per-barrel-mile cost changes in the middle 50 percent of all pipelines." *Id.* at 39,011.

AOPL submitted comments proposing an index level of PPI-FG plus 2.45 percent. It too based its analysis on the Kahn Methodology, but it used both the middle 50 percent and the middle 80 percent of pipelines' cost changes, calculated using accounting data from the Form No. 6 filings. AOPL asserted that FERC had erred in its proposal by using only the middle 50 percent of data rather than incorporating the middle 80 percent of data as well, thereby "eliminat[ing] valuable data regarding pipeline cost changes and therefore fail[ing] to provide the most robust data sample for determining the index." Initial Comments of AOPL at 3, *reprinted in* Joint Appendix ("J.A.") 14. AOPL's expert, Dr. Ramsey D. Shehadeh, Ph.D., determined that the middle 80 percent of data did not include spurious outliers likely to bias the calculation, and he concluded that because "absent errors in the data, using more data points is generally better," there was "no economic justification" for excluding it. Shehadeh Declaration at 8-9, J.A. 51-52.

Various shippers submitted comments proposing, *inter alia*, that the Commission calculate the average change in costs using data from a different part of the regulatory filings than it had used in the past. *See* Joint Comments of Airlines for Am., Nat'l Propane Gas Ass'n, and Valero Marketing & Supply Co. at 9-16, J.A. 126-33. These commenters argued that cost-of-service data from Page 700, a newer part of the pipelines' annual regulatory filings, provides a direct measure of changes in pipelines' per-barrel-mile costs, whereas the accounting data used in the past had merely provided proxies. *Id.* AOPL submitted additional comments opposing the shippers' proposal. *See* Reply Comments of AOPL at 39-41, J.A. 399-401.

Ultimately, the Commission adopted an index of PPI-FG plus 1.23 percent to apply for the five-year period between

2016 and 2021. 2015 Order, 80 Fed. Reg. at 81,744. It rejected AOPL's proposal to include the middle 80 percent of pipeline cost-change data in its analysis, but it adopted the shippers' proposal to switch to using Page 700 cost-of-service data to calculate cost changes for each individual pipeline. *Id.* at 81,744-46, 81,750-51. AOPL filed a petition for review in this court, challenging the Commission's failure to incorporate the middle 80 percent data into its analysis and its use of the Page 700 filings as an input source. A group of shippers intervened in support of the Commission.

## II. Analysis

### A. Standard of Review

We review AOPL's challenge to the 2015 Order under the APA's familiar "arbitrary and capricious" standard. *See* 5 U.S.C. § 706(2)(A); *Wis. Pub. Power Inc. v. FERC*, 493 F.3d 239, 256 (D.C. Cir. 2007). Under that standard, the court must ensure that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). Where an agency's action marks a change in position, the agency must "display awareness that it *is* changing position, . . . [and] show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). But the agency need not demonstrate "that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible . . . , that there are good reasons for it, and that the agency *believes* it to be better." *Id.* "Because the subject of [the court's] scrutiny is . . . ratemaking—and thus an agency decision involving complex industry analyses and

difficult policy choices—the court will be particularly deferential to the Commission's expertise." *AOPL I*, 83 F.3d at 1431.

## B. Statistical Data Trimming

We begin with AOPL's principal contention: that FERC's reliance solely on the middle 50 percent of pipelines' cost-change data and failure to incorporate the middle 80 percent of pipelines' data was arbitrary and capricious for want of a reasoned explanation. Pointing to the Commission's consideration of both the middle 50 percent and middle 80 percent of data in its first and second index reviews, AOPL asserts that the Commission departed from its past practice without reasoned decisionmaking. In particular, AOPL argues that the explanation the Commission provided impermissibly disregarded its prior determination that use of both data sets sufficiently ensures that the index is not adversely affected by statistical outliers, as well as its prior conclusion that using a data set that covered more barrel-miles was superior when that data was available. Additionally, AOPL contends that the Commission's explanation for excluding the middle 80 percent data was invalid because it was driven at least in part by what AOPL characterizes as an impermissible "results-oriented" goal of lowering the index.

We have little difficulty in finding that the Commission adequately and reasonably justified its decision not to consider the middle 80 percent of pipelines' cost-change data. FERC's Order explains that "the middle 50 percent, more effectively than the middle 80 percent, excludes pipelines with anomalous cost changes while avoiding the complexity and distorting effects of subjective, manual data trimming methodologies." 2015 Order, 80 Fed. Reg. at 81,750 P. 42. The Commission noted, as it had in its 2010 index review, that this decision

"returned the Commission's policy to the application of the Kahn Methodology in Order No. 561, which based its calculation of the index on the middle 50 percent alone." *Id.* at P. 42 n.80 (citing 2010 Order, 133 FERC at 62,261-62 PP. 60-63). It further explained:

> Although the middle 80 percent was used in the 2000 and 2005 reviews, the Commission made this change without providing a rationale for the change or explaining the departure from previous practice. Once the issue was presented to the Commission in the 2010 Index Review, the Commission determined that the middle 50 percent alone provided a more appropriate means for trimming the data sample.

*Id.* (citing 2010 Order, 133 FERC at 62,261-62 P. 61).

Nothing in any of the Commission's past index review orders bound the agency to use the middle 80 percent of pipelines' cost-change data in any later proceeding. In its 2003 Order, the Commission stated only that the middle 80 percent data supported the same result reached using the middle 50 percent of data. 102 FERC at 61,540. In its 2006 Order, the Commission stated that "[t]rimming is done to remove statistical outliers, or spurious data points that could bias the mean of the sample in either direction." 114 FERC at 62,038. It noted that both sets of commenters in that proceeding had "constructed the trimmed data sets of the middle 50 percent and middle 80 percent," *id.*, and that by doing the same, it had "ensur[ed] that the index [was] not driven by statistical outliers," *id.* at 62,043. Contrary to AOPL's contention, deciding that consideration of both data sets had sufficiently avoided statistical outliers in 2006 did not preclude the Commission from determining, in 2010 and 2015, that relying

exclusively on the middle 50 percent data set did so more effectively. *See Nat'l Cable & Telecomms. Ass'n v. FCC*, 567 F.3d 659, 667 (D.C. Cir. 2009) ("[A]n agency is free to change its mind so long as it supplies 'a reasoned analysis.'" (quoting *State Farm*, 463 U.S. at 57)).

Petitioner asserts that FERC's statement from the 2010 index review that "it is preferable to apply the larger data set when the additional data is available using the current Kahn Methodology" precluded the Commission from excluding the middle 80 percent of pipelines' data when that data is available and accurate. *See Order Denying Request for Rehearing*, 135 FERC ¶ 61,172, at 62,023 P. 41 (May 23, 2011). But the quoted passage addressed FERC's approach to selecting the pool of pipelines whose costs should be measured at all – not the portion of the resulting data to trim before calculating the normal industry change in costs. *See id.* at P. 41 & n.38. In fact, the Commission rejected the precise principle that AOPL asserts should be gleaned from that passage in the 2010 index review itself. *See* 2010 Order, 133 FERC at 62,261-62 PP. 57, 61 (noting AOPL's comment that the middle 80 percent is preferable because it "would be more inclusive and represent a larger number of pipelines" but concluding that "[t]he middle 50 percent more appropriately adjusts the index levels for 'normal' cost changes").

In its 2015 Order, the Commission again expressly "reject[ed] AOPL's argument that the middle 80 percent should be used merely because it contains more barrel-miles." 80 Fed. Reg. at 81,751 P. 44. It noted that "[t]he Kahn Methodology aims to capture the central tendency of the data set so that the index is not distorted by outlying costs," and that "[p]ipelines in the middle 80 percent, as opposed to the middle 50 percent, are more likely to have outlying cost changes which could result from idiosyncratic factors particular to that pipeline." *Id.*

AOPL offers no convincing rebuttal to FERC's decision. The simple point here is that neither legal nor policy considerations precluded FERC from relying solely on the middle 50 percent of the pipelines' cost-change data.

Furthermore, AOPL's contention that the Commission deviated from past practice without reasoned explanation is belied by the regulatory record. FERC neither disregarded its prior policy decisions nor failed to come to grips with existing precedent. The Commission plainly acknowledged both here and in its 2010 Order that it had considered the middle 80 percent of pipelines' data in the first and second index reviews. In 2010, however, the agency announced its considered judgment that using the middle 50 percent was the superior approach and it explained the basis for its decision. 133 FERC at 62,255, 62,261-62. The Commission's 2015 Order accurately characterized and reaffirmed that conclusion. 80 Fed. Reg. at 81,750 P. 42-44. AOPL's suggestion that FERC cannot rely on the explanation set forth in the 2010 Order because it was not affirmed by this court is simply mistaken. *See* Oral Arg. Recording at 32:01-34:40. That no party appealed the 2010 Order is irrelevant; the Commission is entitled to rely on the precedent it established there, especially when it is clear that the agency acted within legal bounds and with good reasons.

Additionally, the Commission addressed the specifics of the 2015 record. *See* 2015 Order, 80 Fed. Reg. at 81,751 P. 44 nn.83 & 85. It recognized in its 2015 Order the distinctions between the 2010 and 2015 data sets, and it explained its rationale for continuing to exclude the middle 80 percent of data from its calculations despite those distinctions. For example, FERC acknowledged that the middle 50 percent data set covered a greater percentage of industry barrel-miles in 2010 than in did in 2015, but it concluded that "this is not a

sufficient basis to risk including more outlying data." *See id.* at P. 44 n.85. It explained that the 2015 statistically trimmed data set "includes more than 50 percent of industry barrel-miles," and that much of the difference between this set and the 2010 data set was due to the fact that a single pipeline, Enbridge Lakehead, fell within the middle 50 percent in 2010, but not in 2015. *Id*. FERC was under no obligation to maintain the same barrel-mile coverage for each index review.

Finally, contrary to AOPL's assertion, the Commission's explanation does not reveal that it had an irrational purpose of lowering the index level. As support for its theory that FERC's refusal to utilize the middle 80 percent data was impermissibly "results-oriented," AOPL points to a portion of the Commission's explanation in which it noted that "using the middle 80 percent would skew the index upward based upon . . . outlying cost increases" which would "not be offset by similarly outlying cost decreases." *Id.* at 81,750-51 P. 43. But the Commission explained that its concern about outlying cost increases was based upon the negative effect they would have on the formula's ability to achieve its "objective of . . . reflect[ing] normal industry-wide cost changes." *Id.* Thus, the agency was concerned that the outlying data would result in an inaccurate – not merely undesirable – measurement of normal cost changes. AOPL provides no reason to question that conclusion, and neither this court's decision in *AOPL II* nor any of the other cases AOPL cites prevents the Commission from relying on this rationale.

The Commission provided the required reasoned explanation for its decision to exclude the middle 80 percent of pipelines from its analysis. We reject AOPL's assertion to the contrary.

## C. Data Input Source

AOPL also contends that FERC departed from its precedent without a reasoned explanation by calculating the index using Page 700 cost-of-service data instead of using the accounting data from other parts of Form No. 6, as it had in the past. AOPL acknowledges that the Commission recognized this departure and provided an explanation for its decision, but it rejects that explanation as insufficient for two reasons. First, AOPL disagrees with the Commission's determination that the switch will be beneficial. Second, it claims the Commission failed to acknowledge that its decision represents a shift in the very thing that the index and the Kahn Methodology are designed to measure and thus necessarily failed to provide an acceptable justification to support that new aim. We disagree.

On the record before us, it is clear that FERC adequately and reasonably explained its rationale for utilizing the cost-of-service data from Page 700. In its Order, the Commission identified four benefits of switching to the Page 700 data. In particular, the Commission carefully explained that: (1) Using Page 700 data will better suit the index's aim of reflecting changes to recoverable costs. (2) The data will eliminate the need to use proxies to measure capital costs and income tax costs. (3) The data will eliminate the need to use an "operating ratio" estimate, which unrealistically assumes that pipelines incur no capital costs in years in which the operating expenses exceed revenues. FERC concluded that eliminating the operating ratio estimate would lead to more accurate results. (4) And the Page 700 data relates exclusively to interstate pipelines and therefore the measurement will no longer commingle interstate and intrastate costs. *See* 2015 Order, 80 Fed. Reg. at 81,746 PP. 12-16. AOPL has not persuasively refuted FERC's justifications.

The Commission also adequately responded to AOPL's objections to using Page 700 data. For example, AOPL argued that, because Page 700 requires pipelines to make assumptions and allocations, the methodology of which might differ among pipelines or change over time, the change measure might be inaccurate. *See* Reply Comments of AOPL at 44, J.A. 404. The Commission explained that assumptions and allocations would be required under any measurement approach, and it determined that the assumptions should reflect established ratemaking practices and thus should be consistent enough to accurately calculate the index. *See* 2015 Order, 80 Fed. Reg. at 81,746-47 P. 18. AOPL also argued that the return-on-equity element of Page 700 can be highly variable due to changing capital conditions. *See* Reply Comments of AOPL at 41, J.A. 401. FERC responded that this was not a reason to refrain from using the data, as the index is designed to capture changing capital costs, including financing costs. *See* 2015 Order, 80 Fed. Reg. at 81,746 P. 17. AOPL's arguments that these responses were insufficient invite this court to replace the Commission's technical and policy judgments with its own. We must decline. *See State Farm*, 463 U.S. at 43; *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 233 (D.C. Cir. 2008).

Furthermore, there is nothing in the record to support AOPL's assertion that the Commission's shift to using Page 700 data reveals a *sub silentio* shift in its measurement objective. AOPL asserts that the old methodology was meant to support an index based on actual costs that is an *alternative* to the cost-of-service methodology used prior to the Energy Policy Act, while the new approach measures changes in cost recoverable *under* a cost-of-service approach. But the index has always served and continues to serve as an alternative to the individualized cost-of-service-based ratemaking procedures that were used prior to the Energy Policy Act. *See* Order No. 561, 58 Fed. Reg. at 58,758.

Moreover, neither Order No. 561 nor the subsequent index review orders indicate that the index was intended to measure something distinct from the costs measured under its cost-of-service methodology. Rather, the Commission has consistently treated the index as a measure of normal industry-wide cost-of-service changes and it continued to do so in the challenged order. *Compare id.* ("[T]he indexing system utilizes average, economy-wide costs rather than pipeline-specific costs to establish rate ceilings."), *and* Order No. 561-A, 59 Fed. Reg. at 40,245 ("The indexing methodology adopted . . . is fundamentally based on costs . . . [and] most closely approximates the actual cost changes experienced by the oil pipeline industry."), *with* 2015 Order, 80 Fed. Reg. at 81,746 P. 13 ("[T]he index is meant to reflect changes to recoverable pipeline costs, and, thus, the calculation of the index should use data that is consistent with the Commission's cost-of-service methodology.").

Indeed, since it first established the index, the Commission has lamented that it did not have access to a reliable measure of industry-wide total cost-of-service data upon which to base its calculations. *See* Order 561-A, 59 Fed. Reg. at 40,246-47 (stating that "Form No. 6 does not contain the information necessary to compute a trended original cost (TOC) rate base or a starting rate base as allowed for in Order No. 154-B" and that "all agree that the measure of the capital cost component [using Form No. 6 data] of the cost of service is highly unsatisfactory"); *Revision to Form No. 6*, 77 Fed. Reg. 59,739, 59,741 P. 19 (Oct. 1, 2012) (recognizing that past Page 700 filings were unreliable and amending Page 700 instructions). Now that Page 700 makes that data available, and the Commission has concluded that the data is reliable, *see* 2015 Order, 80 Fed. Reg. at 81,745-46 PP. 10-12 & n.24, it was entirely reasonable for the agency to use it in the 2015 Order.

### III. Conclusion

To reiterate, an "agency must show that there are good reasons for [new policies]. But it need not demonstrate to a court's satisfaction that the reasons for the new polic[ies] are *better* than the reasons for the old one[s]; it suffices that the new polic[ies are] permissible under the statute, that there are good reasons for [them], and that the agency *believes* [the disputed policies] to be better, which the conscious change of course adequately indicates." *Fox Television Stations, Inc.*, 556 U.S. at 515. FERC easily satisfied this standard in this case. The Commission carefully addressed the issues, acknowledged its departure from prior decisions, provided extensive explanation for its technical and policy choices, considered the principal alternatives, and responded to Petitioner's arguments. Nothing more was required. We therefore deny the petition for review.

*So ordered.*